SEXTON, Judge Pro Tem.
|,In this tort action, Plaintiffs, Dennis and Betty G. Quillian (collectively “Mr. Quillian”), appeal the judgment of the trial court finding that Mr. Quillian was solely at fault in causing an accident that resulted in his injury and, thus, finding no liability on the part of Defendant, Dixie Bonded Warehouse (“Dixie”) and dismissing the Quillians’ claim with prejudice. For the reasons stated herein, we affirm.

FACTS and TESTIMONY

Mr. Quillian was allegedly injured when he opened the back doors of his trailer and was struck by a bundle of corrugated paper that had shifted during transit from Dixie, in West Monroe, to Plastipak in Pineville. Mr. Quillian was a truck driver for Swift Transportation Company, Inc. (“Swift Transportation”) and, on the day of the accident, was to transport a load of corrugated paper from Dixie to Plastipak. The bundles of corrugated paper are manufactured by Georgia Pacific and stored by Dixie pursuant to a contract between the two companies. This contract provides that Dixie is responsible for “properly and securely palletfing]” the bundles for shipment and for “loading, staking, and pallet-ing the Materials in a safe and secure manner.” Dixie was also under instructions from Georgia Pacific to secure the cargo with dunnage or air bags that were supplied by Georgia Pacific.
Air bags are brown paper bags lined with plastic that are inserted between the cargo as it is loaded and then filled with compressed air pressing the cargo against the walls of the trailer. According to the testimony of other drivers and the expert testimony of Andrew Sievers, a ^safety consultant in vehicle accident litigation, air bags prevent the load from moving sideways (and to a lesser extent forward or backward) and from falling internally and becoming unstable during transit. Mr. Sievers testified that the “[pjurpose of airbag is for the safety of the cargo, not the safety of the people,” meaning that the air bags hold the cargo in place to prevent damage to the cargo during transit. Mike Roberts, shipping and transportation manager with Georgia Pacific, testified that Georgia Pacific regulations require air bags on a full load to secure cargo. Significantly, air bags were also available and could be installed at Georgia Pacific’s office facility, which is in the vicinity of the Dixie warehouse. Drivers routinely picked up loads from Dixie and then stopped at the nearby Georgia Pacific office for paperwork. In addition, Plastipak required that loads delivered to its plant be secured with air bags.
On the day of the accident, Bobby Foster, the foreman at Dixie, loaded Mr. Quil-lian’s trailer with 52 corrugated paper bundles. Mr. Foster testified that he drives the forklift and handles the paperwork for loading and unloading trailers at Dixie. He loads approximately 8-10 trailers per *73 day and has been doing this type of work for 20 years. Mr. Foster testified that he loaded the bundles in Mr. Quillian’s 53 foot trailer in a staggered format and the bundles were double-stacked, which resulted in a stair-step formation of bundles with more bundles on the bottom level than on the top. The bottom level of bundles approached the 48 foot mark in the trailer, leaving several feet between the bottom level of bundles and the trailer doors. Mr. Foster testified that, normally, air bags would be inserted during |sthe loading process and that these bags reduce the amount of side-to-side shifting of the cargo.
According to Mr. Foster and Dixie owner Richard McGivern, Dixie’s air compressor was broken on that date; and, therefore, air bags were not used to secure the load in Mr. Quillian’s trailer. Mr. Foster testified that he advised Mr. Quillian of this and told him that he could get air bags at the Georgia Pacific office where Mr. Quillian was picking up his paperwork. According to Mr. Foster, Mr. Quillian replied that he was only going 120 miles and that he did not need air bags. Mr. McGi-vern testified that he was in constant contact with Georgia Pacific and that those in charge at Georgia Pacific and the dedicated fleet drivers were all aware that the compressor was down and that, if they wanted air bags, the driver was to go by the Georgia Pacific office to have air bags put in with the cargo. Mr. McGivern testified that the compressor was usually located on the Dixie loading dock and it was common knowledge that the compressor was down. In addition, Mr. Quillian was at Dixie almost daily and there was no doubt in Mr. McGivern’s mind that Mr. Quillian knew that the compressor was broken.
Mr. Quillian, however, maintains that he was unaware that air bags had not been inserted during the loading process and he would not have transported the cargo without the air bags had he known. Mr. Quillian testified that, while Mr. Foster was loading his trailer, he was assisting Dixie by moving trailers around on the premises. Mr. McGivern denied this in his testimony and Mr. Foster stated that Mr. Quillian was not allowed to 14move trailers. He testified that Mr. Quillian was on the dock talking with the other drivers while his trailer was being loaded. Mr. Quillian testified that, after the trailer was loaded, he pulled the trailer forward about ten feet, visually inspected the load, which appeared to him to be secure, and installed a load lock on the bottom row of bundles and closed the trailer doors.
The record contains much testimony about the necessity for, and proper placement of, load locks. Load locks are the property of the carrier and are installed by the driver. Mr. Roberts with Georgia Pacific testified that Georgia Pacific requires two load locks to secure cargo. As stated, Mr. Quillian installed one load lock on the bottom row of bundles. When asked why he did not install a load lock on the top row of bundles, Mr. Quillian replied that he could not climb on the bundles as they were unstable and so it was not safe to do so. In this regard, we note that Mr. Quil-lian testified that he did not observe the loading of the trailer and was never on the loading dock. In fact, Mr. Quillian testified that he was not allowed on the loading dock.
Mr. Foster, however, testified that it is normal practice for drivers to watch from the loading dock as he loads a trailer and to install load locks during the loading process. Mr. McGivern testified that he never instructed a driver that he could not be on the loading dock. He explained that the drivers would place the load locks and Mr. Foster would place air bags from the *74 loading dock after trucks were loaded. Drivers would inspect the cargo after loading from the loading dock. Further, Mr. Sievers testified that the |fimost appropriate place to install a load lock on this particular load of cargo would have been on the top level of bundles because it was the upper level that was subject to moving or tumbling toward the back of the trailer during transit. In addition, Ronald Baird, a friend and co-worker of Mr. Quillian’s at Swift Transportation, confirmed in his testimony that two load locks were used when there were two stacks of cargo, as in this case. If there was only one level of cargo, only one load lock was needed.
In any event, Mr. Quillian testified that he drove to Pineville and had no indication during the drive that the load was shifting. Once at Plastipak, he opened the right door uneventfully. Mr. Quillian testified that he looked in the trailer, but did not notice any bundles out of place. He stated that he then jerked on the left door; and, when the door opened, a bundle fell out of the truck and struck him on his right side head, neck and shoulder area causing him to fall to his knees and sustain injuries.
There are discrepancies in the testimony regarding Mr. Quillian’s failure to see a bundle leaning on the left door and the manner in which Mr. Quillian opened the left door. As stated, Mr. Quillian maintains that he looked into the trailer and did not see any bundle(s) out of place. Mr. Quillian explained that he was standing behind the left door unlatching the two latches:
A: And as I pulled, that load, wherever it was it at, it came and hit this door, and when it hit the door it spun me around like that, and then the unit fell on me.
Q: Did it take the door out of your hand?
A: Yeah. It took my hand off it just as fast.
IfiQ: So — but you were behind that door when you were opening it?
A: Yes, sir. Until it caught my shoulder and spinned me around, you know, in the opening there.
On the other hand, Mr. Sievers testified that, in order for the bundle to have fallen out like Mr. Quillian suggests, it would have to have been leaning on the left door and it would have been in plain view had Mr. Quillian looked in the trailer after opening the right door. Mr. Sievers opined that “[f]or [the bundle] to come out it has to be right up against the trailer door.” He repeatedly stated that there would be no line of sight problem once the right door was open:
All you’ve got to do is stick your head in there and you can see the whole distance of that door from the center of the door all the way up to the left hand wall. Absolutely you can see in there.... It’s there to be seen.... All you’ve got to do is look ... It’s not an issue of do I have enough light or do I have enough visibility, it’s — there’s plenty of room.
Next, there is considerable disagreement about whether Mr. Quillian properly opened the left door. Mr. Sievers testified that drivers are trained to use the left door as a shield to prevent injury such as the one claimed by Mr. Quillian. In his deposition, Mr. Quillian did not mention opening the left door in this fashion. At trial, however, he testified that he did use the left door as a shield, but that the door did not hit him; rather, the cargo hit him on the right side. Mr. Sievers explained that, if Mr. Quillian did use the door as a shield, it was impossible for the bundle to hit him in the right side head/neck/to.’so region. According to Mr. Sievers, the bundle would have caused the door to hit Mr. Quillian and might possibly have hit his lower legs as it fell to the ground. Mr. Sievers explained:
*75 |7What I’m saying — that it doesn’t make sense. His story doesn’t make sense. If he’s using the trailer door as a shield he doesn’t get hit on the right side of his face. The door hits him, not the cargo. And the cargo would hit him probably in the legs so it doesn’t make sense. So there’s a factual issue in my opinion based on years of experience of having drivers do similar things and handling these exact same kind of accidents as an expert witness I don’t know how it could happen the way he describes it if he’s in fact using the door as a shield.
In Mr. Sievers’ expert opinion, in order for Mr. Quillian to have been hit by the bundle as he described, he would have to have been standing in the breach — the open space as the left door opens — and would have been pushing the left door open, thereby placing himself in a position to be hit by falling cargo.
Furthermore, we note that Mr. Baird testified that Mr. Quillian related to him that he had opened the doors to the trailer, taken the load locks off and had turned his back to the trailer to bring the locks down to size so that he could secure them back onto the truck when the bundle fell out of the trailer and hit him on the back of the head and neck. On the other hand, another friend and fellow truck driver of Mr. Quillian’s, Sam Rymer, testified that he was present at the time at the time of the accident. Mr. Rymer testified that he was in line waiting for dock space to unload his trailer. He stated that he could see the back end of Mr. Quillian’s trailer and observed Mr. Quillian open the right door and he “went around the other side” and opened the left door, which he had to jerk on to get open. Mr. Rymer explained that he “couldn’t see everything exactly what side it hit him on, but.... that thing came out and he went to the ground.”
| sAfter the accident, Mr. Quillian drove back to West Monroe. He sought medical attention for his injuries the following day.[1] According to Mr. Quillian, there were no outward signs of injury, other than a possible abrasion. He did, however, undergo several surgeries for upper back issues. There was also evidence that Mr. Quillian suffers from degenerative disk disease and had some back issues prior to the instant injury.
Mr. Quillian ultimately filed this lawsuit against Dixie for damages and Swift Transportation intervened for reimbursement. After a bench trial, which included a visit by the trial judge to the loading dock at Dixie, the judge found that Mr. Quillian was the sole “fault source” for this accident. In reasons for judgment, the trial judge stated that Mr. Quillian failed to produce any evidence of state or federal regulations or favorable industry standards requiring the use of air bags. He further found that Mr. Quillian failed to inspect his load prior to leaving Dixie. Finally, making a credibility determination, he found that the evidence “profoundly demonstrated” that Mr. Quillian failed to properly open the doors of his truck when he arrived at Plastipak, ie., that Mr. Quillian did not use the door as a shield or stand to the side and that he provided more than one version of events. Accordingly, the trial judge ruled in favor of Dixie and dismissed Mr. Quillian’s claim with prejudice. This appeal ensued.

DISCUSSION

Expert Witness

As a threshold matter, we note that Mr. Quillian challenges the trial *76 judge’s refusal to allow the testimony of his truck safety expert. The identity of expert witnesses must be disclosed at least 90 days prior to trial in the absence of a contrary order of the court. La. C.C.P. art. 1425. A scheduling order of the court requiring a “will call” list of witnesses within three weeks of trial is not such a contrary order allowing the addition of expert witnesses who have not been otherwise timely identified. Since Mr. Quillian’s potential expert witness was identified only 60 days prior to trial, the trial judge was within his discretion in disallowing his testimony.

Determination of Fault

A trial court’s findings of fact will not be disturbed on appeal unless the reviewing court finds that they are clearly wrong or manifestly erroneous. Stobart v. State through Department of Transportation and Development, 617 So.2d 880 (La.1993); Holland v. State Farm Mutual Automobile Insurance Company, 42,753 (La.App.2d Cir.12/05/07), 973 So.2d 134. To reverse a fact finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra. If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart, supra.
| mWhere two permissible -views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989). Further, when findings are based on determinations regarding credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Rosell v. ESCO, supra. Only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in that which is said. Rosell v. ESCO, supra.
In the case sub judice, there was differing testimony on each of the key factual findings of the trial judge. First, the testimony established that air bags are typically used to prevent cargo from falling internally and moving side to side. Mr. Sievers testified that the use of air bags is primarily to prevent damage to the cargo, rather than to prevent injury to drivers. In any event, Mr. Foster testified that Mr. Quilli-an knew he did not have air bags in the load and Mr. Quillian admitted that he knew that air bags were available at the Georgia Pacific office near Dixie. Mr. Foster further testified that Mr. Quillian told him that he did not need air bags on the load because he was only traveling a short distance to Pineville. Though Mr. Quillian disputes this testimony, the trial judge credited Mr. Foster’s testimony and our reading of the testimony as a whole reveals no abuse of discretion in that credibility call.
Further, Mr. Quillian agreed that load locks are the main safety mechanism to prevent cargo from falling out when the doors to the Intrailer are opened. Georgia Pacific safety regulations require two load locks. Mr. Quillian, however, installed only one load lock on the bottom level of bundles. According to Mr. Foster, Mr. Quillian could have installed a second load lock on the top level during loading if Mr. Quillian had asked Mr. Foster to stop the loading process to allow him to do so. Moreover, recall that Mr. Sievers testified that the most appropriate place for a load lock on this type of load is on the top level of bundles to prevent the top level of bun- *77 dies from toppling toward the back of the trailer, exactly what happened in this case. It does not seem to be in dispute that a load lock placed on the upper level of bundles would have prevented the backward movement of the bundles and, thus, prevented this accident.
The record also contains contradictory evidence and opinion as to whether Mr. Quillian properly inspected the load prior to leaving Dixie. Mr. Quillian testified that he pulled the trailer about ten feet from the loading dock and observed the load from the ground and that it “looked good.” He claims that he did not notice the absence of air bags. He placed the one load lock, closed and sealed the doors and left for Pineville. Mr. Sievers testified that this was not an inspection of the load and Mr. Foster testified that most drivers observe the trailer as it is being loaded and are allowed on the loading dock to inspect the load prior to leaving Dixie. Mr. Quillian did not inspect the load from the dock. Again, faced with two permissible views of this evidence, the trial judge reasonably concluded that Mr. Quillian failed to properly inspect the load.
| ^Finally, the testimony regarding the manner in which Mr. Quillian opened the left door of the trailer varies, even among Mr. Quillian’s version(s) of the accident. The record does not reflect any clear error in the trial judge’s acceptance of Mr. Siev-ers’ testimony regarding how the door must have been opened, ie., with Mr. Quil-lian standing in the breach of the doors, in order for the accident to have happened the way Mr. Quillian submits.
Thus, pretermitting an analysis of the respective duties of the parties herein, based on our review of the record, we find no manifest error in the trial judge’s conclusion that Mr. Quillian was 100 percent at fault for this accident. The record contains a reasonable factual basis for each of the trial judge’s factual findings. In addition, we afford much deference to the trial judge’s determinations of credibility of the witnesses and we will not disturb these findings on appeal.

CONCLUSION

For the foregoing reasons, the judgment of the trial court in favor of Dixie Bonded Warehouse, Inc., and against Dennis and Betty G. Quillian and dismissing their claims with prejudice, is affirmed. Costs of appeal are assessed to Dennis and Betty G. Quillian.
AFFIRMED.
APPLICATION FOR REHEARING
Before GASKINS, CARAWAY, DREW, MOORE & SEXTON (Pro Tempore), JJ.
Rehearing denied.

. According to his testimony, Mr. Quillian could not be seen at the clinic to which he was referred by his insurance carrier because it was closed when he returned to West Monroe. He went to the clinic the next day.